**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JANE DOE, *individually, and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> TRACKI, INC.; TRACKIMO, INC.; and TRACKIMO LLC; <br><br> Defendants. | Civil Action No.: 1:25-cv-6577-AT-HJR |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS..................................................................................2

    A.   Defendants and Their Product ...................................................................2

    B.   Defendants' Design, Marketing and Foreseeable Misuse .......................2

    C.   The Stalking of Plaintiff ...........................................................................3

III.   STANDARD OF REVIEW.................................................................................3

IV.    ARGUMENT ......................................................................................................4

    A.   The At-Risk Classes are Ascertainable and Have Article III Standing...................4

        i.    The At-Risk Classes are Ascertainable..............................................4

        ii.   The At-Risk Classes Have Article III Standing ................................6

    B.   Both Aiding and Abetting Claims are Adequately Pled.........................8

        i.    Plaintiff has Adequately Pled Aiding and Abetting Under New York Law......................................................................................8

        ii.   The Tennessee Aiding and Abetting Claim is Equally Well-Pled, as the Same Allegations of Knowledge and Substantial Assistance Satisfy Tennessee's Standard ........................................................11

    C.   The FAC Plausibly Alleges a Claim for Unjust Enrichment ...............12

    D.   Plaintiff's Negligence and Gross Negligence Claims are Legally Cognizable as Defendants Owed Plaintiff a Duty of Care...........................................12

        i.    Legal Standard ..................................................................................13

        ii.   Defendants Had a Legal Relationship with Both the Stalker and Plaintiff....14

        iii.  Balancing Policy Considerations Supports the Imposition of a Duty............15

        iv.   Foreseeability Defines the Scope of that Duty.................................16

        v.    Defendants' Neutral Manufacturer Cases are Inapplicable ...........17

    E.   John Doe's Criminal Misuse Does Not Cut Off Defendants' Liability ...............19

        i.    Third-Party Criminal, as Opposed to Noncriminal Conduct, Does Not Trigger a "Special Relationship" Requirement or Heightened Duty Standard ..........................................................................................19

ii.  Even Assuming, Arguendo, Defendants' Heightened Standard Applied, Their Analysis Rests on a Blatant Mischaracterization of the FAC ..............21

F.  The FAC Adequately Alleges Gross Negligence Under New York and Tennessee Law ........................................................................................................................22

G.  The Tennessee Products Liability Act Governs Plaintiff's Negligence and Gross Negligence Claims Under Tennessee Law .................................................24

i.  The Tracki Device Was in a Defective Condition ........................................25

ii.  The Tracki Device was Unreasonably Dangerous Under Both Statutory Tests ......................................................................................................................27

1.  Prudent Manufacturer Test (Risk-Utility Analysis)................................27

2.  Consumer Expectation Test ....................................................................29

iii.  Defendants' Abnormal Use Defense Fails as a Matter of Law and Fact.......30

H.  The New York Failure to Warn Claims are Well-Pled and Legally Sufficient.....31

I.  The Design Defect Claim is Well Pled.................................................................34

V.  CONCLUSION ...........................................................................................................37

**TABLE OF AUTHORITIES**

*Alston v. Caraco Pharm., Inc.*
    670 F. Supp. 2d 279 (S.D.N.Y. 2009) ...............................................................32

*Anderson v. Hedstrom Corp.*
    76 F. Supp. 2d 422 (S.D.N.Y. 1999) ................................................................31

*Andres v. Town of Wheatfield*
    621 F. Supp. 3d 415 (W.D.N.Y. 2022)............................................................4, 5

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ......................................................................................2, 4

*Ashour v. Ariz. Beverages United States LLC*
    2022 U.S. Dist. LEXIS 193603 (S.D.N.Y. 2022) .............................................12

*Axon v. Florida's Natural Growers, Inc.*
    813 F. App'x 701, 706 (2d Cir. 2020)...............................................................12

*Barban v. Rheem Textile Sys.*
    2005 U.S. Dist. LEXIS 5996 (E.D.N.Y. Feb. 11, 2005) ..............................32, 35

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ...................................................................................2, 3, 4

*Carovillano v. Sirius XM Radio Inc.*
    715 F. Supp. 3d 562, 586 (S.D.N.Y. 2024) ......................................................12

*Carter v. Scripps Networks, LLC,*
    670 F. Supp. 3d 90 (S.D.N.Y. 2023) ..................................................................6

*C.M v. Est. of Archibald*
    2022 U.S. Dist. LEXIS 64328 (S.D.N.Y. Apr. 6, 2022) ...................................22

*Curtis v. Universal Match Corp.*
    778 F. Supp. 1421 (E.D. Tenn. 1991) ...............................................................25

*Denney v. Deutsche Bank AG*
    443 F.3d 253 (2d Cir. 2006) ..............................................................................7

*Dolphin Holdings, Ltd. v. Gander & White Shipping, Inc.*
    122 A.D.3d 901 (App. Div. 2d Dep't 2014).......................................................22

*Dragon Inv. Co. II LLC v. Shanahan*
    854 N.Y.S.2d 115 (1st Dep't 2008)...................................................................12

*Elsroth v. Johnson & Johnson*
  700 F. Supp. 151 (S.D.N.Y. 1988) .................................................................................17

*Erdem v. J.B. Hunt Transp., Inc.*
  2023 U.S. Dist. LEXIS 15194 (E.D. Tenn. Jan. 30, 2023) ...............................................23

*Forni v. Ferguson*
  232 A.D.2d 176 (N.Y. 1st Div. 1996) ..............................................................................18

*F.T.C. v. CyberSpy Software, LLC*
  No. 6:08-cv-1872 (M.D. Fla. 2008) ..........................................................................10, 16

*Gold v. Eva Naturals, Inc.*
  586 F. Supp. 3d 158, 160 (E.D.N.Y. 2022).........................................................................6

*Hain v. Jamison*
  68 N.E.3d 1233 (N.Y. 2016) ............................................................................................32

*Hamilton v Beretta U.S.A. Corp.*
  96 N.Y.2d 222 (N.Y. Ct. App. 2001) ...................................................................13, 15, 16

*Howe v. Ethicon, Inc.*
  2022 U.S. Dist. LEXIS 117292 (S.D.N.Y. June 27, 2022) ...............................................23

*In re Bookends & Beginnings LLC*
  2022 U.S. Dist. LEXIS 161695 (S.D.N.Y. 2022) ...............................................................4

*In re Petrobras Securities Litigation*
  862 F.3d 250, 267 (2d Cir. 2017) ...................................................................................5, 6

*Katz v. Dale Pharmacy & Surgical, Inc.*
  2022 U.S. Dist. LEXIS 38023 (E.D.N.Y. Mar. 2, 2022)......................................................4

*Kirschner v. Bennett*
  648 F. Supp. 2d 525 (S.D.N.Y. 2009) ................................................................................8

*Lindsay v. Ortho Pharmaceutical Corp.*
  637 F.2d 87 (2d Cir. 1980)...............................................................................................32

*Liriano v. Hobart Corp.*
  700 N.E.2d 303 (N.Y. 1998) ............................................................................................32

*Lynch v. Bay Ridge Obstetrical & Gynecological Assoc., P.C.*
  532 N.E.2d 1239 (N.Y. 1988) ..........................................................................................32

*Matter of New York City Asbestos Litig.*
  59 N.E.3d 458 (N.Y. 2016) ........................................................................................31, 34

iv

*McCarthy v. Olin Corp.*
119 F.3d 148 (2d Cir. 1997) ...................................................................................17, 20

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
693 F.3d 145 (2d Cir. 2012) ..........................................................................................7

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*
354 F. Supp. 2d 357 (S.D.N.Y. 2005) ........................................................................8, 10

*Palka v Servicemaster Mgt. Services Corp.*
83 N.Y.2d 579, 584 (N.Y. App. 1994) ...........................................................................13

*Phillips v. Kimwood Machine Co.*
269 Ore. 485, 525 P.2d 1033 (Or. 1974) .......................................................................28

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.,*
2012 Tenn. App. LEXIS 288 (May 4, 2012).....................................................................11

*Portelli v. Garcia*
756 N.Y.S.2d 415 (Sup. Ct. 2003) ................................................................................13

*Potter v. Ford Motor Co.*
213 S.W.3d 264 (Tenn. Ct. App. 2006).........................................................................25

*Pulka v. Edelman*
40 N.Y.2d 781 (1976).................................................................................................20

*Purdy v. Pub. Adm'r of Westchester Cnty.*
72 N.Y.2d 1 (1988)....................................................................................................20

*Ray by Holman v. BIC Corp.*
925 S.W.2d 527 (Tenn. 1996) ...........................................................................24, 27, 28

*Remler v. Cona Elder Law, PLLC*
2022 U.S. Dist. LEXIS 177660 (E.D.N.Y. Sep. 29, 2022) .................................................22

*Robinson v. Reed-Prentice Div. of Package Mach. Co.*
49 N.Y.2d 471 (N.Y. Ct. App. 1980) .............................................................17, 18, 19, 37

*Rodriguez v. Westech Sec. & Investigation Inc.*
2026 U.S. Dist. LEXIS 54670 (S.D.N.Y. Mar. 16, 2026)....................................................5

*Shoemaker v. Omniquip Int'l*
152 S.W.3d 567 (Tenn. Ct. App. 2003).........................................................................25

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*
    605 U.S. 280 (2025) ................................................................................................9

*Smith v. Zoll Med. Corp.*
    505 F. Supp. 3d 787 (W.D. Tenn. 2020) ......................................................25, 27, 31

*Sorto Romero v. Delta Int'l Mach. Corp.*
    2007 U.S. Dist. LEXIS 71588 (E.D.N.Y. Sept. 24, 2007) .................................35

*Tasini v. AOL, Inc.*
    851 F. Supp. 2d 734 (S.D.N.Y. 2012) ...............................................................12

*TransUnion, LLC v. Ramirez*
    594 U.S. 413 (2021) ..........................................................................................6, 7

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*
    136 F. Supp. 2d 253 (S.D.N.Y. 2001) ................................................................22

*Twitter, Inc. v. Taamneh*
    598 U.S. 471 (2023) ............................................................................................9

*Voss v. Black & Decker Mfg. Co.*
    450 N.E.2d 204 (N.Y. 1983) .........................................................................32, 34

*Waterhouse v. Tenn. Valley Auth.*
    475 F.Supp.3d 817 (E.D. Tenn. 2020) ...............................................................23

*Watson v. K-VA-T Food Stores, Inc.,*
    2023 U.S. Dist. LEXIS 5001 (E.D. Tenn. Jan. 11, 2023) ..............................23, 24

*Whaley v. Rheem Mfg. Co.*
    900 S.W.2d 296 (Tenn. Ct. App. 1995)................................................................24

*Winfield v. Citibank, N.A.*
    842 F. Supp. 2d 560 (S.D.N.Y. 2012) ..................................................................5

**Other**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................3

Restatement (Second) of Torts § 876(b) ........................................................................11

Tenn. Code Ann. § 29-28-102(2) .............................................................................25, 29

Tenn. Code Ann. § 29-28-102(8) ..................................................................................27

Tenn. Code Ann. § 29-28-105(a) ..................................................................................24

Tenn. Code Ann. § 29-28-105(b) ................................................................................ 25

Tenn. Code Ann. § 29-28-108 .................................................................................... 30

Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. (1973) ................... 28, 35

Plaintiff Jane Doe ("Plaintiff"), by and through her undersigned counsel, respectfully submits this Opposition to Defendants' Motion to Dismiss[1].

## I.  INTRODUCTION

Defendants Tracki, Inc. and Trackimo, Inc. (collectively "Defendants") ask this Court to dismiss every count of Plaintiff's First Amended Complaint ("FAC") on a central premise: the intervening criminal acts of a third party insulate Defendants from any and all liability. But this premise misapplies the law and ignores the detailed factual record. Contrary to that assertion, this case is not about the misuse of a product by a criminal third-party. Rather, it's about a deliberate business model built on facilitating non-consensual surveillance through dangerous design choices, affirmative marketing to stalkers, and ongoing technical assistance that enables stalking to continue.

The FAC plausibly alleges that Defendants designed a GPS tracking device (the "Tracki") specifically optimized for concealment; published step-by-step instructions and blog posts instructing – and encouraging – purchasers on how to secretly attach a device to another person's vehicle (or person) without their knowledge; aggressively marketed Tracki as a tool for covert surveillance of spouses and 'loved ones'; designed the device to be undetectable by smartphone alert systems that warn users of unwanted tracking (while trumpeting this as a selling point); and admitted in their own FAQs that the device may be untraceable even after discovery. ¶¶ 4, 11, 25-38, 54, 138. Defendants then profited from subscription fees paid by stalkers to maintain real-time access to victims' locations, while ignoring warnings that their devices were being used for illegal stalking. ¶¶ 39, 41-45. This is not an ordinary product that was merely misused; it is one

---

[1] Defendants Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 69-1) is referred to herein as "MTD". All references to "¶" or "FAC" are to Plaintiff's First Amended Complaint (ECF No. 56) in this case.

deliberately designed, marketed, and operated in a way that foreseeably and repeatedly produced the very harm suffered by Plaintiff and the class. And, Defendants are liable for their conduct.

In short, Plaintiff seeks to hold Defendants liable for their conscious, reckless, and negligent decisions in designing, marketing, and operating a product and subscription platform in a manner that actively enabled, facilitated, encouraged, and profited from the very harm Plaintiff suffered – a harm that was entirely foreseeable and preventable. Defendants should not be permitted to profit from a business model built on foreseeable harm and then invoke hypothetical consequences to escape accountability. Taking Plaintiff's well-pled factual allegations as true and construe all reasonable inferences in the light most favorable to her, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), Plaintiff has more than met her burden. Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Defendants and Their Product

Defendants design, advertise, sell, and operate small, concealable GPS tracking devices and a subscription-based software platform that enable real-time, continuous location monitoring through their servers and mobile application. ¶¶ 2,5, 22, 25, 32, 39-45. The system provides precise geolocation data and geofence alerts to subscribers. ¶¶ 43–44. This is not a passive product: Defendants actively facilitate tracking through their infrastructure. Each transmission of Plaintiff's location required Defendants' servers, cellular connectivity, and subscription service; without them, the tracking could not occur. ¶¶ 40–45.

### B.    Defendants' Design, Marketing and Foreseeable Misuse

Defendants have long known their devices are used for stalking and unlawful surveillance. ¶¶5, 11, 48. Yet, they failed to implement basic safeguards, while affirmatively marketing the

2

devices for tracking individuals in real time. ¶¶3-4, 25-30, 55, 139-141, 150-151. Defendants promote their devices as easily hidden and emphasize the product's small size and difficulty to detect. ¶¶25-30. Unlike Bluetooth trackers, Defendants' devices rely on GPS, cellular, and Wi-Fi networks, rendering them effectively undetectable by widely available smartphone safety alerts – a feature Defendants touted as a competitive advantage. ¶¶4, 34. Users must subscribe to a paid service through which Defendants collect, process, and transmit precise geolocation data in real time. ¶¶41-45. Defendants also fail to include features that make the device identifiable. ¶54. In short, Defendants designed and promoted a system optimized for covert surveillance while omitting available safeguards and identifying information.

### C. The Stalking of Plaintiff

Plaintiff was harmed in a completely predictable and forseeable manner. ¶¶6, 59–76. Around July 2024, Plaintiff's stalker placed a Tracki device on her vehicle using a weatherproof magnetic case, enabling continuous, undetected tracking. ¶¶ 33-35, 59–63, 71. Using Defendants' platform, the stalker monitored her movements, followed her, and identified locations to which she had travelled. ¶¶ 64–70. The device went undetected despite multiple searches, including by law enforcement, underscoring just how effectively Defendants' product evades detection when concealed as instructed. ¶¶70–75. The stalker was later convicted. ¶76. As a result, Plaintiff has suffered and continues to suffer severe emotional distress and other expenses for legal protection and security measures. ¶¶ 74–75.

### III.    STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at 678; *Twombly*, 550 U.S. at 555. At this stage, Plaintiff is not required to *prove* her case – she need only plead sufficient facts to render her claims plausible. The FAC more than satisfies this standard.

## IV.   ARGUMENT

### A.  The At-Risk Classes are Ascertainable and Have Article III Standing

A motion to strike class allegations at the pleading stage is heavily disfavored, including by Courts in this Circuit. *See In re Bookends & Beginnings LLC,* 2022 U.S. Dist. LEXIS 161695, *3-4 (S.D.N.Y. 2022) (collecting cases). Courts grant such motions only where certification is impossible regardless of discovery. As set forth below, the At-Risk Classes satisfy both the ascertainability requirement and Article III's standing threshold — and Defendants' arguments to the contrary misapprehend the nature of the risk their products pose and the legal standards governing pre-injury class claims.

### i.  The At-Risk Classes are Ascertainable

"In the Second Circuit, 'motions to strike class allegations are often denied as premature.'" *Andres v. Town of Wheatfield,* 621 F. Supp. 3d 415, 418 (W.D.N.Y. 2022) (quotation omitted). Courts routinely find that a determination of whether Rule 23's requirements are met "is more properly deferred to the class certification stage, where a more complete factual record can aid the court in making this determination." *Katz v. Dale Pharmacy & Surgical, Inc.,* No. 20-CV-1876 (WFK) (TAM), 2022 U.S. Dist. LEXIS 38023, at *10 (E.D.N.Y. Mar. 2, 2022), *adopted by* No.

4

20-CV-1876 (WFK)(TAM), 2022 U.S. Dist. LEXIS 51033 (E.D.N.Y. Mar. 22, 2022) (quoting

*Winfield v. Citibank, N.A*., 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) and collecting cases). *See*

*also Andres v. Town of Wheatfield*, 621 F. Supp. 3d 415, 419 (W.D.N.Y. 2022) (class definition can

be amended as litigation progresses). This approach is consistent with "the ongoing refinement

and give-and-take inherent in class action litigation, particularly in the formation of a workable

class definition." *Id.* (quotation omitted). Thus, because the class definitions in the FAC may be

amended at a later date as litigation progresses, Defendants' motion to strike the At-Risk Classes

should be denied as premature.

Defendants' ascertainably challenge is similarly premature. Ascertainability relates to the

workability of a class definition and is a class certification issue. *See, e.g.*, *Rodriguez v. Westech*

*Sec. & Investigation Inc.,* 2026 U.S. Dist. LEXIS 54670, at *13 (S.D.N.Y. Mar. 16, 2026) (deciding

ascertainability at the class certification stage). It is unsurprising, then, that, in challenging

ascertainability, Defendants cite only to class certification decisions. *See* MTD at 11-12. Because

class certification is the appropriate juncture to determine if class membership is "truly

indeterminable," *Rodriguez*, 2026 U.S. Dist. LEXIS 54670, at *13 (quotation omitted),

ascertainability is not a valid basis for dismissal at this stage.

Defendants also misstate the ascertainability standard in this Circuit. In *In re Petrobras*

*Securities Litigation*,[2] the Second Circuit clarified that its previous decision in *Brecher*, the

authority on which they rely (MTD at 11-12), "did not create an independent administrative

feasibility requirement" and further declined to adopt such a standard. 862 F.3d 250, 267 (2d Cir.

2017).[3] Instead, the ascertainability requirement in this Circuit merely "asks district courts to

---

[2] *Petrobas* is also a class certification decision.
[3] "The [*Brecher*] opinion's language about 'administrative feasibility' and 'mini-hearings' was not strictly part of the holding, and was not intended to create an independent element of the

consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. That analysis is not severe and, instead is a "modest threshold requirement" that "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* Defendants fail to cite the appropriate standard for good reason, it is fatal to their premature attempt to strike Plaintiff's class claims.

### ii.  The At-Risk Classes Have Article III Standing

Defendants' Article III challenge also misses the mark. Defendants argue that the definition of the At-Risk Classes "falls squarely within the holding of *TransUnion, LLC v. Ramirez*, 594 U.S. 413 (2021), because injuries to putative members of the At-Risk Classes are predicated on speculation that they may be tracked by Tracki devices in the future without their consent. MTD at 13. This is a misreading of *TransUnion*, a post-certification decision, and a misconstruction of the proper Article III standing analysis at the motion to dismiss stage.

"Standing in the class action context requires a bifurcated inquiry." *Gold v. Eva Naturals, Inc.,* 586 F. Supp. 3d 158, 160 (E.D.N.Y. 2022)[4] (quotation omitted). First, the named plaintiff must establish that they have Article III standing[5]—an injury in fact, caused by the defendant, that would likely be redressed by judicial relief. And second, the plaintiff must establish that they have class standing—(1) that they have personally suffered an actual injury a result of the defendant's conduct, and (2) that the defendant's conduct implicates "the same set of concerns" as the conduct

---

ascertainability test; rather, that language conveyed the purpose underlying the operative requirements of definiteness and objectivity." *In re Petrobas Sec. Litig.*, 862 F.3d at 267.

[4] *Gold* is a post-*TransUnion* decision where the court incorporated *TransUnion* in its analysis.
[5] At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice [for purposes of demonstrating standing]." *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 94 (S.D.N.Y. 2023).

alleged to have caused injury to other members of the putative class by the same defendant.[6] *Id.* at 161.

For purposes of the first inquiry, Defendants do not challenge or so much as address the individual Article III standing of Plaintiff, whose stalker used a Tracki device to hunt and terrorize her and who faces a substantial risk and fear of repeated injury in the future.[7] *See* FAC ¶¶ 59-76, 80. Rather, Defendants focus only on putative class members. While it is true that, in this Circuit, a class may not be **certified** if members lack Article III standing,[8] *see Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006), the named plaintiff in a putative class case need not establish Article III standing for all putative class members at the motion to dismiss stage. Defendants offer no authority for any such requirement. Defendants also fail to challenge or address the second standing inquiry at the motion to dismiss stage, class standing. Here, the question is whether Plaintiff personally suffered an actual injury because of Defendants' misconduct and whether that misconduct implicates the same set of concerns as the conduct that injured members of the putative At-Risk Classes. The answer to both questions is yes. Defendants offer no argument—nor could they—as to how or why its alleged misconduct implicates different concerns for Plaintiff and putative members of the At-Risk Classes.

---

[6] The class standing inquiry is rooted in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145 (2d Cir. 2012), a Second Circuit, pleadings-stage decision that remains good law post-*TransUnion*. *See id.* at 162 ("[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual... injury as a result of the putatively illegal conduct of the defendant,'…and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants….".))

[7] Plaintiff alleges concrete harm, both economic injuries and severe emotional distress, not a mere statutory violation, as was the case in *TransUnion*.

[8] Absent class member standing is a certification question that was not reached by the Supreme Court in *TransUnion*. *See TransUnion*, 594 U.S. at 431 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class.").

### B. Both Aiding and Abetting Claims are Adequately Pled

Plaintiff's FAC sets forth specific allegations showing that Defendants not only knew of the underlying unlawful conduct but took concrete steps to substantially assist it – allegations that, if proven, satisfy all elements of aiding-and-abetting and are sufficient to survive a motion to dismiss under *Twombly* and *Iqbal*.

### i. Plaintiff has Adequately Pled Aiding and Abetting Under New York Law

To plead aiding and abetting under New York law, a plaintiff must allege "(1) a violation by the primary wrongdoer, (2) knowledge of the wrongful conduct by the aider and abettor, and (3) substantial assistance by the aider and abettor in achieving the violation." *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 377 (S.D.N.Y. 2005) (internal citations omitted). Defendants do not – and cannot – dispute that the FAC adequately alleges a primary violation. Their challenge is confined to the second and third elements: knowledge and substantial assistance. MTD at 14-17. What remains before this Court, then, is a singular and straightforward question: whether Defendants knowingly and substantially facilitated that violation. The FAC answers that question unequivocally: they did.

At minimum, the FAC pleads conscious avoidance. Under New York law, knowledge may be established where a defendant suspects a fact, realizes its probability, and deliberately refrains from confirming it. *See Kirschner v. Bennett,* 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (internal quotations omitted). Defendants' repeated exposure to complaints, subpoenas, and communications describing nonconsensual tracking – and their decision to continue business as usual – adequately allege facts supporting liability.

The FAC alleges far more than conscious avoidance: Defendants were repeatedly confronted with concrete evidence that their product was being used for stalking and continued to

8

facilitate that conduct. ¶¶ 11, 25–29, 48. Defendants' characterization of this as mere after-the-fact notice "that potential wrongful tracking has already taken place in a small number of cases" misstates the pleadings. MTD at 15. The FAC alleges ongoing, contemporaneous knowledge and participation – Defendants received frequent law enforcement subpoenas related to stalking, assisted customers in tracking individuals, responded to inquiries from users expressing intent to track others without consent, and published marketing and instructions encouraging covert monitoring of "loved ones". ¶¶11, 25-29, 48. These allegations support actual knowledge and active participation, not passive awareness. The cases Defendants cite – where defendants merely provided lawful products without particularized knowledge or assistance – are inapposite.

In *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), the Supreme Court rejected aiding-and-abetting liability based on ordinary commercial sales and a failure to prevent their downstream misuse, emphasizing that liability requires culpable participation in specific wrongdoing – not mere nonfeasance. *Id.* at 293-295. The FAC alleges the opposite: Defendants provided direct, targeted assistance to the very conduct at issue by helping users engage in nonconsensual tracking (¶¶11, 48); instructing them how to conceal devices (¶¶26-28); marketing Tracki for undetectable surveillance (¶¶25-28, 37-38, 48, 53-54); and continuously transmitting Plaintiff's real-time location data (¶¶42-45, 53). This is affirmative, knowing participation – not routine commerce.

The same distinction defeats Defendants' reliance on *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), where liability was rejected because the platform provided neutral, widely available services with no nexus to the specific attack. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498, 504 (2023). Here, the FAC alleges direct assistance, concealment guidance, and continuous, account-

9

specific tracking tied to Plaintiff's harm. ¶¶11, 26-28, 41-45, 48. This is the "conscious, voluntary, and culpable participation" *Taamneh* contemplates. *Taamneh* at 486.

This case instead resembles enforcement actions such as *F.T.C. v. CyberSpy Software, LLC*, where liability arose from designing, marketing, and supporting a product for covert surveillance. *F.T.C. v. CyberSpy Software, LLC*, No. 6:08-cv-1872 (M.D. Fla. 2008). There, the FTC sued the maker of a keylogger program called "RemoteSpy" that was designed to be installed "without the knowledge or consent of the owner or authorized user of a computer, and [the] Defendants' marketing touts this function." *Id.* at 2. The court recognized "the ability of RemoteSpy to invade the privacy of an unsuspecting victim is, indeed, alarming. And it is to this use that Defendants direct their promotional and instructional materials. In light of these marketing efforts, the potential for devastating abuse far outweighs the possibility of benign use." *Id.* at 4. Like the spyware at issue in *CyberSpy*, Tracki devices are specifically designed and promoted for undetectable tracking, with instructions for enabling their clandestine deployment. ¶¶ 26–28, 33–37, 53. Those parallels underscore—not undermine— Plaintiff's allegations.

Substantial assistance exists where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *OSRecovery, Inc. v. One Groupe Int'l, Inc.,* 354 F. Supp. 2d 357, 378 (S.D.N.Y. 2005). Here, Defendants did far more than "routine business services" (MTD at 16-17) of selling a product: they operated the infrastructure that made stalking possible – collecting, processing, and transmitting Plaintiff's real-time location data to her stalker through their servers and applications (¶¶40-45); actively assisting users through their helpdesk to carry out nonconsensual tracking (¶¶11, 48); publishing step-by-step instructions sourced from "spying activities experts" and marketing the device's ability to evade detection safeguards (¶¶26-27, 33-37, 53); and maintaining an ongoing service relationship

10

with Plaintiff's stalker with "[e]ach location ping and data refresh" (¶¶43-45) representing an active, server-side act by Defendants. Without Defendants, the stalking "could not have worked at all." ¶45. That is substantial assistance.

Finally, Plaintiff need not plead specific communications between Defendants and the stalker at this stage, particularly where such facts are within Defendants' control. The FAC plausibly alleges knowing, substantial assistance, which is sufficient under *Twombly*.

### ii. The Tennessee Aiding and Abetting Claim is Equally Well-Pled, as the Same Allegations of Knowledge and Substantial Assistance Satisfy Tennessee's Standard

For the same reasons set forth above, the FAC also adequately pleads aiding and abetting under Tennessee law. Tennessee follows the Restatement (Second) of Torts, imposing liability where a defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other…" *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp*., 387 S.W.3d 525, 552-553, 2012 Tenn. App. LEXIS 288, *59-62 (May 4, 2012) (quoting Restatement (Second) of Torts § 876(b)). Courts applying Tennessee law look to the same core elements addressed above: knowledge of wrongful conduct and substantial assistance. *See id.*

The FAC alleges both. Defendants were repeatedly confronted with concrete evidence of nonconsensual tracking - through law enforcement subpoenas, user communications, and complaints – yet continued to facilitate it. ¶¶11, 25-29, 48. It also alleges extensive affirmative conduct, including providing instructions and operating the infrastructure that made the stalking possible. *Id.* Without Defendants' support, the stalking could not have occurred. Taken together, these allegations plausibly establish knowledge and substantial assistance, which is sufficient under Tennessee law.

### C. The FAC Plausibly Alleges a Claim for Unjust Enrichment

Under New York law, unjust enrichment may be pled in the alternative, particularly alongside fraud-based allegations. *See Ashour v. Ariz. Beverages United States LLC*, 2022 U.S. Dist. LEXIS 193603, *13 (S.D.N.Y. 2022) (quoting *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 706 (2d Cir. 2020)). The claim is distinct from tort theories because it seeks disgorgement of benefits unjustly obtained, not compensatory damages. *See Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 586 (S.D.N.Y. 2024).

To state a claim, Plaintiff must allege that Defendants were enriched at Plaintiff's expense and that equity and good conscience require restitution. *See Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (internal citations and quotations omitted). The "essential inquiry" is "whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id.* at 739-40 (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 49 A.D.3d 403, 854 N.Y.S.2d 115, 118 (1st Dep't 2008)). Defendants need not have a direct relationship with plaintiff. MTD at 19.

Those elements are met here. Defendants were enriched through sales of Tracki devices and subscriptions used to facilitate nonconsensual tracking, including Plaintiff's stalking. ¶¶ 41–42, 115–117. That enrichment came at Plaintiff's expense because it was generated through a business model that enabled the very conduct causing her harm. Equity does not permit Defendants to retain profits derived from facilitating covert surveillance of unwitting individuals. Accordingly, Plaintiff states a non-duplicative claim for restitution of ill-gotten gains.

### D. Plaintiff's Negligence and Gross Negligence Claims are Legally Cognizable as Defendants Owed Plaintiff a Duty of Care

Plaintiff's negligence and gross negligence claims are legally cognizable as Defendants owed Plaintiff a duty of care.

12

### i.    Legal Standard

"[A] duty of reasonable care owed by a tortfeasor to an injured party is elemental to any recovery in negligence." *Palka v Servicemaster Mgt. Services Corp.*, 83 N.Y.2d 579, 584 (N.Y. App. 1994) (citations omitted). "Foreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist." *Hamilton v Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (N.Y. Ct. App. 2001). Notably, "[t]he duty to control the conduct of others may arise where there is a relationship between the defendant and the person who threatens the harm **or** where there is a relationship between the defendant and the person exposed to the harm which requires the defendant to afford protection from certain dangers including the conduct of others." *Portelli v. Garcia*, 756 N.Y.S.2d 415, 418 (Sup. Ct. 2003) (emphasis added).

"Unlike foreseeability and causation…the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges[.]" *Palka*, 83 N.Y.2d at 585. Rather than an "algebraic formula[,]" a court's duty inquiry is context-based, "coalesce[ing] from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility." *Id.* Thus, "[c]ourts traditionally fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability[.]" *Hamilton*, 96 N.Y.2d at 232 (quotations omitted).

The context point is critical.  Defendants' motion asks this Court to abandon this nuanced framework in favor of a rigid 'as goes one manufacturer, must go all' dogma. They beseech the Court to ignore the specific context of their subscription-mediated surveillance platform,

13

demanding that the Court view Tracki's active infrastructure through the same lens as a passive seller of a standalone good. This is not how New York law functions.

### ii. Defendants Had a Legal Relationship with Both the Stalker and Plaintiff

Defendants are not manufacturers that merely sold a product and then disengaged. Rather, they operate an ongoing surveillance service – of which Plaintiff was the victim. Thus, Defendants maintained a legal relationship with both Plaintiff's stalker and Plaintiff, each of which gives rise to a duty.

First, Defendants maintained a direct, ongoing legal (and contractual) relationship with the stalker. When he subscribed to Tracki's platform and covertly affixed a device to Plaintiff's vehicle, he did not purchase a static good; he engaged a continuous, server-mediated surveillance infrastructure. ¶ 41. Defendants furnished the essential components of that stalking: the proprietary servers that received each GPS transmission, the software platform that stored and processed Plaintiff's granular location data, and the real-time interface through which John Doe monitored Plaintiff's movements. *Id.* ¶¶ 39-45. This was not a one-time "sale" that terminated upon delivery. It was an active, continuous, server-dependent service that Defendants provided, maintained, and billed for throughout the duration of the stalking. Defendants held the ongoing authority—as the service provider and account host—to terminate his access, suspend the account, or prevent the real-time transmission of location data. This continuing relationship with Plaintiff's stalker— which Defendants do not dispute existed at the time Plaintiff's harm occurred—constitutes the first legal relationship giving rise to duty.

The second relationship—with Plaintiff—arises from the fact that she was the direct subject of Defendants' ongoing data collection and processing. Plaintiff was not a stranger to Defendants' platform; she was the individual whose movements were the object of Defendants' data collection.

14

Every minute of every day, Defendants' servers were actively collecting her real-time geographic coordinates, processing that data, and streaming it to her stalker's device. ¶¶ 40-45. She was the precise data point upon which Defendants' business model operated. By positioning themselves as the continuous collector, processor, and transmitter of Plaintiff's private, real-time location data, Defendants created a direct functional relationship with her. Having placed themselves in the position of processing her personal data and facilitating its delivery to her abuser, Defendants fostered a legal relationship with Plaintiff giving rise to duty.

### iii.    Balancing Policy Considerations Supports the Imposition of a Duty

The balance of policy considerations likewise supports the imposition of a duty. *See Hamilton*, 96 N.Y.2d at 232. Defendants argue otherwise on two grounds. First, they contend that it would be "impossible…to insure [that] users will not adapt the product to suit their own unique purposes." MTD at 22 (quotation omitted). Second, they assert that recognizing such a duty would "stifle" product development and innovation. *Id*. Defendants are wrong on both points, and further fail to address the countervailing considerations in the duty analysis, all of which weigh in favor of recognizing a duty here.

As to Defendants' points, this case does not require policing every possible user modification; it requires only that Defendants adopt the same industry-standard safety features—such as anti-stalking alerts and consent protocols—already implemented by their competitors. ¶¶ 34-36, 48. Defendants' "innovation" is not the advancement of GPS technology, but the active optimization of their platform for covert surveillance. Imposing a duty on potential victims does not "stifle" innovation; it simply forces them to stop marketing "undetectable tracking" as a feature (¶ 71 n. 31) and internalize the costs of a business model built largely on the foreseeable harm of victims like Plaintiff.

15

Weighed against these non-existent concerns is a systemic public safety crisis that Defendants' own actions have fueled. Stalking is an epidemic: nearly one in three women and one in six men experience this terrifying violation in their lifetime, with forty percent of victims targeted by current or former intimate partners. *Id.* ¶¶ 7-8. Technology-facilitated stalking—using GPS trackers to monitor victims in real time—has become the primary instrument of this crisis, transforming domestic abuse from a local incident into a persistent, national threat to bodily integrity and autonomy. *Id.* ¶ 9.

*F.T.C. v. Cyberspy Software LLC* is instructive. No. 08-1872, 2008 WL 5157718 (M.D. Fla. Nov. 25, 2008). Therein, the court enjoined the sale of keystroke logging software not simply because it existed, but because the defendants actively marketed the product's covert capabilities and operated the server infrastructure through which stolen data flowed. *Id.* at *1-2. The court's logic was unequivocal: although the product had "legitimate uses," these were outweighed by the health, safety, and privacy concerns of third parties. *Id.* Similarly here, the capacity for devastating abuse was not incidental to Defendants' platform—it was a profitable feature that Defendants knowingly marketed, enabled and monetized. The balancing of policy considerations weighs strongly in favor of imposing a legal duty.

### iv.    Foreseeability Defines the Scope of that Duty

Once either of these relationships is established, foreseeability defines the scope of Defendants' duty to Plaintiff. *Hamilton*, 96 N.Y.2d at 232. Given the obvious foreseeability of the precise harm suffered by Plaintiff—if not Defendants' active encouragement of that misuse—the scope of Defendants' duty necessarily extends to protecting against the unlawful tracking and resulting harm inflicted on Plaintiff.

16

Defendants knew, or should have known, that their devices were being used for stalking; they received multiple subpoenas each week from local, federal, and international law enforcement agencies concerning the use of Tracki devices in cases involving stalking, harassment, domestic violence, and even attempted murder. ¶11. Defendants were also aware of such unlawful and tortious uses through criminal investigations, customer communications, media coverage, and public-interest reporting. *Id*. ¶¶ 5, 9, 11, 56, 138. Moreover, Defendants affirmatively marketed their devices as superior tools for tracking individuals, including for the surreptitious monitoring of persons who did not wish to be tracked. *Id*. ¶¶ 25-38.

Given that Defendants actively cultivated the very market for covert surveillance that caused Plaintiff's injuries, the risk of stalking was not merely foreseeable—it was a predictable and recurring feature of their business model. Consequently, the scope of Defendants' duty necessarily encompasses a requirement to implement the basic, industry-standard safety measures that would have prevented this foreseeable catastrophe.

### v.   Defendants' Neutral Manufacturer Cases are Inapplicable

Defendants cite numerous cases for the proposition that manufacturers owe no duty to third-party victims of criminal misuse. MTD at 20-25. But those cases involved static, completed goods—like ammunition, industrial machinery, or pre-packaged medicine—where the manufacturer's involvement ended definitively once the product changed hands. *See Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471 (N.Y. Ct. App. 1980) (machine manufacturer sold a completed, safe product that was modified by a third party years post-sale); *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997) (ammunition manufacturer owed no duty for third-party criminal use of a finished, non-defective product*); Elsroth v. Johnson & Johnson*, 700 F. Supp. 151 (S.D.N.Y. 1988) (manufacturer had no duty to prevent the unforeseeable criminal

tampering of an over-the-counter drug product that left its facility in a safe, sealed condition); *Forni v. Ferguson*, 232 A.D.2d 176 (N.Y. 1st Div. 1996) (no duty for the lawful distribution of a non-defective firearm product where manufacturer had no post-sale role in the misuse).

Unlike those cases, Tracki is a subscription-based service where the manufacturer's involvement begins at the point of sale and continues as an indispensable participant. The device is not a standalone product; it is a hardware terminal for an ongoing, server-mediated data service that Defendants operate, host, and bill for. Defendants maintained a direct, ongoing ability to terminate the subscription and disable the platform—thereby preventing the harm—at any point before, during, or after the stalking began, an ability that the manufacturers in every one of Defendants' cited cases categorically lacked.

Defendants' heavy reliance on *Robinson* is particularly striking, as it not only fails to support their position but fundamentally undermines it. MTD at 20–23. In *Robinson*, the manufacturer sold a completed, safe machine to a third-party business and equipped it with a functioning safety gate that prevented operator access to dangerous parts. Robinson, 49 N.Y.2d at 475-77. The manufacturer's duty ended because it had provided a finished, safe product, and the injury only occurred because the purchaser later engaged in a substantial, post-sale modification that dismantled those safety features. *Id*. at 480–81.

Here, the facts are the exact inverse. Rather than providing a 'finished' and 'safe' product, Defendants deliberately omitted the safety features that their market competitors have already made standard. ¶¶ 34-36, 55. Defendants did not sell a device with an 'interlock' that the stalker then 'removed'; they sold a device that was *designed* to be undetectable and *marketed* as a tool for surreptitious surveillance. *Id.* ¶¶ 25-28, 33-37. While *Robinson* protected a manufacturer who took affirmative steps to prevent dangerous misuse, Defendants took affirmative steps—publishing

18

concealment guides, providing real-time data processing, and marketing evasion capabilities—to *facilitate* it. If *Robinson* stands for the principle that a manufacturer is not liable when a buyer defeats safety features, then Defendants—who never provided those safety features in the first place—are the antithesis of the *Robinson* defendant.

### E.  John Doe's Criminal Misuse Does Not Cut Off Defendants' Liability

Largely regurgitating their previous argument, Defendants contend that New York law precludes a duty of care whenever a third party engages in criminal conduct, absent a "special relationship" between the manufacturer and the wrongdoer. MTD at 23-25. This is not the governing standard. Even if it were, Defendants' argument rests on two baseless factual assertions: that they maintained no ongoing relationship with the stalker, and that they were powerless to prevent or mitigate the stalker's conduct. *Id.* at 24. Defendants' reliance on inapposite cases regarding neutral product sales and hyperbolic analogies (discussed above) cannot mask their active, revenue-generating role as the indispensable infrastructure of Plaintiff's stalking.

> ### i.  Third-Party Criminal, as Opposed to Noncriminal Conduct, Does Not Trigger a "Special Relationship" Requirement or Heightened Duty Standard

Defendants appear to suggest that the mere fact that the third party's conduct was criminal somehow alters governing New York standards for establishing a duty in cases involving third-party conduct. It does not. Plaintiff has already set forth the applicable standards governing the existence of a duty here, including the standards applicable where the risk of harm arises from the conduct of a third party. *See supra* § IV(D)(i). As explained in the preceding section, Plaintiff has established the requisite duty through two independent legal relationships: one between Defendants and the stalker, and another between Defendants and Plaintiff. *Id.* § IV(D)(ii). The imposition of this duty is further bolstered by the context-specific facts of this case and weighing

19

policy considerations. *Id.* § IV(D)(iii). Whether conduct is "criminal" versus "non-criminal" does not change the analysis.

Defendants nevertheless contend that, "when negligence is predicated on the criminal conduct of third parties, New York law requires that a special relationship exist between the wrongdoer and the manufacturer, such that the manufacturer [has] authority and [is] able to exert control over the tortfeasor." MTD at 23 (citing *McCarthy v. Sturm, Ruger & Co.*, 916 F. Supp. 366, 369 (S.D.N.Y. 1996)). But *McCarthy* does not hold that the mere fact of "criminal" conduct triggers a distinct special-relationship requirement, much less one limited to a master-servant form of control. Rather, *McCarthy* stands for the unremarkable proposition that foreseeability alone does not create a duty; instead, as Plaintiff explained above, some legally cognizable relationship beyond mere foreseeability is required before "New York courts…impose a duty to control the actions of third parties." *McCarthy*, 916 F. Supp. at 369 (citing *Purdy v. Pub. Adm'r of Westchester Cnty.*, 72 N.Y.2d 1, 8 (1988); *Pulka v. Edelman*, 40 N.Y.2d 781, 783 (1976)).

Indeed, *McCarthy's* citation to *Purdy* merely restates the very standard Plaintiff has already set forth above: "In the ordinary circumstance, common law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; liability for the negligent acts of third persons generally arises when the defendant has authority to control the actions of such third persons[.]" *Purdy*, 72 N.Y.2d at 8. As explained above, this standard is met in this case.

ii.    **Even Assuming, *Arguendo*, Defendants' Heightened Standard Applied, Their Analysis Rests on a Blatant Mischaracterization of the FAC**

Even if Defendants' heightened standard applies to criminal conduct (it does not), their analysis turns entirely on a fundamental mischaracterization of the FAC's allegations. According to Defendants:

> Here, the Complaint asserts that John Doe stalked Plaintiff and that, in doing so, he made use of a Tracki. Nonetheless, the Complaint does not contain any factual assertions that Defendants possessed knowledge of John Doe's actions, maintained any form of relationship with him, or had any communication with him whatsoever. Indeed, the record is devoid of any indication that Defendants and John Doe were connected in any manner, other than him purchasing a Tracki. See FAC ¶ 6. As a direct consequence of this absence of a special relationship, Defendants could not have exercised any control over John Doe's conduct. Lacking the capacity to exert control is a critical deficiency

MTD at 24-25.

As explained above, these premises collapse under the weight of the FAC's allegations. Defendants did not merely sell John Doe a product; they entered into an ongoing contractual subscription relationship and provided the continuous, server-dependent service that was integral to the harm inflicted on Plaintiff. Nor was that harm some unforeseeable misuse at the margins of the product. To the contrary, the very type of unlawful tracking at issue here was central to Defendants' marketing and the functionality of their platform. *See supra* § IV(D)(ii)-(iii), (v).

Moreover, as Plaintiff has explained, Defendants possessed the ability to control and materially limit users' ability to commit such crimes through readily available, industry-utilized safeguards, yet failed to implement them. *Id*. Accordingly, even under Defendants' own self-invented, legally baseless, heightened standard, their argument fails on its own terms.

21

**F. The FAC Adequately Alleges Gross Negligence Under New York and Tennessee Law**

Under New York law, gross negligence requires a duty, breach, injury, and conduct reflecting "'a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.'" *See Remler v. Cona Elder Law, PLLC*, No. 21-CV-5176 (ARR) (LB), 2022 U.S. Dist. LEXIS 177660, at *21-22 (E.D.N.Y. Sep. 29, 2022) (citations omitted). Recklessness means "an extreme departure from the standards of ordinary care, such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citation omitted). Whether conduct rises to gross negligence is generally a question of fact, not suitable for resolution on a motion to dismiss. *See C.M v. Est. of Archibald*, No. 20-CV-751 (VSB), 2022 U.S. Dist. LEXIS 64328, at *19 (S.D.N.Y. Apr. 6, 2022) ("The issue of gross negligence is a question of fact for a jury to determine.") (quoting *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 136 F. Supp. 2d 253, 256-57 (S.D.N.Y. 2001)); *Dolphin Holdings, Ltd. v. Gander & White Shipping, Inc.*, 122 A.D.3d 901, 902 (App. Div. 2d Dep't 2014) (same). At the pleadings stage, Plaintiff needs only allege facts supporting each element, including recklessness. *See Dolphin Holdings*, 122 A.D.3d at 903. This, of course, includes plausible allegations suggesting that the defendant's conduct was a reckless disregard for the rights of others.

Plaintiff does so here. The FAC identifies the complained-of conduct and plausibly states each element of a gross negligence claim,[9] including recklessness. Tracki purposefully designed and openly marketed its tracking device as a tool for tracking humans and actively sought and gained a foothold in that market. ¶¶ 50-58. Contrary to Defendants' suggestion, Plaintiff alleges far more than the "general product liability allegations" that were insufficient to state a gross

---

[9] The first three elements, duty, breach, and injury, are discussed above in the context of Plaintiff's negligence claim.

22

negligence claim in *Howe v. Ethicon, Inc.,* No. 21-CV-2031 (NSR), 2022 U.S. Dist. LEXIS 117292 (S.D.N.Y. June 27, 2022). *Id.* at *19. And Plaintiff does not "mainly rel[y]" on a single Tracki blog post.[10] (MTD at 27) Rather, Plaintiff alleges the blog post as but one data point demonstrating Tracki's marketing campaign aimed at bad actors and its blatant disregard for the danger that its product poses. In addition to other alleged misconduct, by providing stalkers with how-to guidance on using Tracki devices to track victims surreptitiously, Tracki demonstrates an extreme departure from the ordinary standard of care. Whether the reckless misconduct that Plaintiff alleges is justified by Tracki's thief-deterrence explanation is a question of fact not suitable for resolution at this juncture.

These same allegations satisfy Tennessee's standard for gross negligence, which requires "'a conscious neglect of duty or a callous indifference to the consequences.'" *Erdem v. J.B. Hunt Transp., Inc.,* No. 3:22-CV-00216-JRG-CRW, 2023 U.S. Dist. LEXIS 15194, at *11 (E.D. Tenn. Jan. 30, 2023) (quoting *Waterhouse v. Tenn. Valley Auth.*, 475 F.Supp.3d 817, 825 (E.D. Tenn. 2020)); *see also Watson v. K-VA-T Food Stores, Inc.,* No. 3:21-CV-00244-DCLC-DCP, 2023 U.S. Dist. LEXIS 5001, at *8 (E.D. Tenn. Jan. 11, 2023) ("[A] party must establish the elements of a traditional negligence claim and that the act at issue was 'done with utter unconcern for the safety of others' or 'with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law' to show gross negligence."). Plaintiff's allegations, taken as a whole, show Defendants' callous indifference to the consequences of its conduct and breach of its duty of care and, as explained above, its reckless disregard for the rights of others. Where a reckless

---

[10] Contrary to Tracki's assertion, Plaintiff in no way concedes that "monitoring children" is a "lawful" use of a tracking device. *See* MTD at 27. Whether Tracki's couching of its how-to guidance and marketing materials catered to stalkers in "spouses" and "loved ones" language insulates it from a finding of recklessness is a fact question for a jury.

disregard is alleged, a defendant's conscious indifference is implied. *See Watson*, 2023 U.S. Dist. LEXIS 5001, at \*8. As in New York, whether conduct rises to the level of gross negligence is not appropriate for dismissal at the pleadings stage. *See id.*

### G. The Tennessee Products Liability Act Governs Plaintiff's Negligence and Gross Negligence Claims Under Tennessee Law

Defendants are liable under the Tennessee Products Liability Act ("TPLA") for designing, marketing, and distributing a product that was defective and unreasonably dangerous when it left[11] their control. *See* Tenn. Code Ann. § 29-28-105(a); *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995). Under Tennessee law, a plaintiff need not prove both conditions – either alone is sufficient to establish liability – and here, the FAC plausibly alleges both. *See Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 529 n.4 (Tenn. 1996). The TPLA governs all product liability actions, including those based on negligence, gross negligence, and strict products liability. Tenn. Code Ann. § 29-28-102(6) establishes that:

> "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, *design*, formula, preparation, assembly, testing, service, *warning*, *instruction*, *marketing*, packaging or labeling of any product.

> "Product liability action" includes, but is not limited to, all actions based upon the following theories: *strict liability in tort; negligence*; breach of warranty, express or implied; *breach of or failure to discharge a duty to warn or instruct*, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; *or under any other substantive legal theory in tort or contract whatsoever*.

(emphasis added).

---

[11] Arguably, the product never fully left Defendants' control, as its continued operation depended on Defendants' infrastructure and involvement – Defendants had to record, store, and transmit the location data through their servers and applications, (FAC ¶¶39-45, 104-106) and, in some instances, actively interacted with users who expressed an intent to commit future unlawful acts (¶¶11, 48).

24

Plaintiff's FAC properly pleads claims for Negligence (Count VI), Strict Products Liability (Count VIII), and Gross Negligence (Count XI) under the TPLA.[12] These fact intensive inquiries concerning if a product is defective or unreasonably dangerous are generally a question for the jury. *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1427 (E.D. Tenn. 1991) (internal citations omitted).

### i.    The Tracki Device Was in a Defective Condition

A product is "defective" when its condition "renders it unsafe for normal or anticipatable handling and consumption" Tenn. Code Ann. § 29-28-102(2); *Smith v. Zoll Med. Corp.*, 505 F. Supp. 3d 787, 795 (W.D. Tenn. 2020). Courts evaluate defectiveness in light of "the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market," Tenn. Code Ann. § 29-28-105(b), as well as "the customary design, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products." *Shoemaker v. Omniquip Int'l,* 152 S.W.3d 567, 573 (Tenn. Ct. App. 2003). Evidence of a "technologically feasible and practical alternative design" that reduces or prevents plaintiff's harm is always "highly relevant and probative". *Potter v. Ford Motor Co.*, 213 S.W.3d 264, 269 (Tenn. Ct. App. 2006).

The FAC alleges that Tracki devices were defectively designed because Defendants made deliberate engineering choices that rendered them uniquely dangerous and unsafe for foreseeable misuse – nonconsensual tracking – despite available, practical alternatives. Defendants omitted basic safeguards, including any alert or notification to a person being tracked (¶¶ 3–5, 33–35, 57); designed removable identification so a discovered device could not be traced back to its user (¶¶37,

---

[12] Plaintiff expressly pled the Tennessee negligence and gross negligence claims in the alternative to the TPLA.

54, 57); and imposed no consent or verification requirements (¶¶3, 55). Each safeguard was feasible, and already used in competing products, underscoring that safer alternatives existed. ¶¶ 3-4, 25, 34, 139.

Beyond the engineering deficiencies, Defendants affirmatively marketed Tracki devices in ways that emphasized—and indeed celebrated—the very characteristics that render it dangerous to nonconsensual tracking victims. *See* ¶36 (blog post noting how victims must manually search for the device or purchase bug sweepers to look for and locate Defendants' trackers); ¶37 ("If this sticker was removed and is missing there's no way we can track back the device to whoever was using it or purchased it"); ¶31 (noting Tracki's intentional design to be "1/3 or less the size of and [sic] any other competing GPS tracker" so they can "discreetly be placed with [a] low possibility of detection."); ¶27 ("It's a big challenging, but any person will have a hard time discovering it."); ¶27 ("… or worse, the driver may discover your tracker). Put simply, Defendants promoted Tracki's miniature size and concealability as core selling points, advertised its capacity for covert, real-time location monitoring, and directed marketing toward use cases involving the surreptitious surveillance without any accompanying disclosure that such use may be unlawful or any prompt requiring the tracked individual's consent. ¶¶ 27, 31, 36-37. Taken together, the design and marketing encouraged the covert surveillance uses that constitute "anticipatable handling" under the statute.

These allegations support two independent inferences: Defendants knew the product would be used for covert tracking because they *promoted* that use, and they intentionally engineered it without safeguards that could have mitigated the resulting risk. A manufacturer cannot disclaim foreseeability of a use it actively encourages. Defendants' design choices and marketing strategy thus operated in tandem to produce a product optimized for undetectable surveillance. As alleged,

absent these defects, Plaintiff's stalker would not have been able to use the device to track and harass her.

### ii. The Tracki Device was Unreasonably Dangerous Under Both Statutory Tests

The TPLA defines "unreasonably dangerous" using two independent, disjunctive tests: (1) the *consumer expectations test*, which asks whether the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics"; and (2) the *prudent manufacturer test*, which asks whether, "because of its dangerous condition [the product] would not be put on the market by a reasonably prudent manufacturer or seller assuming that the manufacturer or seller knew of its dangerous condition" (the prudent manufacturer test). Tenn. Code Ann. § 29-28-102(8); *Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 529–31 (Tenn. 1996). The tests address distinct concerns, involve different elements, and require different types of proof. They are "neither mutually exclusive nor mutually inclusive." *Id.* at 531. While the tests differ in approach, they yield the same result: Defendants' product was defective and/or unreasonably dangerous when it left their control and that this defect proximately caused Plaintiff's injuries. *See Smith v. Zoll Med. Corp.*, 505 F. Supp. 3d 787, 795 (W.D. Tenn. 2020).

### 1. Prudent Manufacturer Test (Risk-Utility Analysis)

The prudent manufacturer test requires "proof about the reasonableness of the manufacturer or seller's decision to market a product assuming knowledge of its dangerous condition." *Ray by Holman*, 925 S.W.2d at 531. Unlike the consumer expectation test, the buyer's expectations are irrelevant; the focus is on the seller. *Id.* at 531. This Court must impute knowledge of the product's dangerous condition to Defendants and ask whether, given that knowledge, a prudent manufacturer would market that product. *Id.* at 530 (citing *Phillips v. Kimwood Machine*

27

*Co.*,269 Ore. 485, 525 P.2d 1033, 1036 (Or. 1974)). Where, as here, the manufacturer actively encouraged illegal and unlawful uses of its product, the answer is a resounding no. ¶¶ 25-26, 29, 53. In balancing the relevant factors set forth in *Ray by Holman*, every consideration favors Plaintiff. *Ray by Holman*, 925 S.W.2d at 532 (citing Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837-37 (1973)).

First, any potentially legitimate uses of Tracki devices including fleet management or asset protection (MTD at 27), can all be served by a device that includes anti-stalking safeguards while refraining from marketing and encouraging illegal and tortious conduct. The utility of a product like Defendants, can still exist where the device is not wholly undetectable. ¶¶ 3-4, 23, 34. The safety factors, which contemplate the likelihood and severity of injury, overwhelmingly support Plaintiff. Tracki devices have been repeatedly used as instruments of stalking, domestic violence, and—in at least one publicly reported case—murder. ¶¶ 5-6, 11, 48. Defendants received multiple law enforcement subpoenas *per week* related to stalking and harassment facilitated by their product. ¶11. Third, competing products already serve the same legitimate purposes without Tracki's dangerous design, and these substitute products are not affirmatively marketed for illegal uses. ¶¶3-4, 23, 25-27, 29-30, 34, 38, 53-56. Fourth and relatedly, the existence of competing products with anti-stalking features further establishes that the unsafe conditions associated with Defendants' products could be eliminated or substantially mitigated, all while preserving the product's utility. For instance, Defendants could have incorporated detection/notification systems, ceased publishing concealment instructions, or implemented subscriber identity verification systems. ¶¶ 26–27, 34, 54.

The fifth factor, the user's ability to avoid danger, is also telling. The entire point of the Tracki's design and marketing structure is that tracked individuals *cannot* and will not detect the

28

devices. Plaintiff and other victims of covert GPS tracking have no meaningful ability to avoid the danger where the product is specifically engineered to prevent detection. ¶¶ 3–5, 33–35. Similarly, the sixth factor considers the user's awareness of the danger. Here, the "user" who faces the danger is not the *purchaser* but the unwitting stalking victim (who could be anyone in the general public). It logically flows that a person who does not know they are being tracked cannot have awareness of the danger. Moreover, ordinary consumers are generally unaware that GPS based trackers are being used to stalk and harass unsuspecting individuals because they do not trigger anti-stalking alerts developed for other Bluetooth-based devices — a distinction which Defendants proactively tout as a competitive advantage. ¶¶ 33–35. The seventh and final factor concerns the feasibility of spreading the loss. Defendants operate a subscription-based business model generating recurring revenue from every active device and are well-positioned to internalize any costs associated with implementing anti-stalking safeguards, while simultaneously can avoid costs by simply altering their marketing strategy. ¶¶ 40–45, 107. The risks posed by Defendants' products far outweigh any proposed utility of Defendants' product.

### 2. Consumer Expectation Test

Under the consumer expectation test, a product is "unreasonably dangerous" if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer" with the "ordinary knowledge common to the community regarding the product's characteristics." Tenn. Code Ann. § 29-28-102. Ordinary consumers would not expect that a manufacturer, like Defendants, would actively and boldly encourage the illegal use of its product to harm others – yet that is precisely what Defendants have done, including through their helpdesk and communications with users. ¶¶ 4, 11, 48. Nor would ordinary consumers possess specialized knowledge of the device's real-time tracking capabilities or the malicious ways in which it can and will be misused.

29

Accordingly, Defendants' Tracki device fails to meet the safety expectations of an ordinary purchaser.

### iii.    Defendants' Abnormal Use Defense Fails as a Matter of Law and Fact

Defendants contend that the stalking use of the Tracki was "abnormal" and therefore outside the scope of the TPLA. MTD at 31. This argument fails for two independent reasons. First, the statutory exclusion Defendants invoke applies only where a product "is not unreasonably dangerous." Tenn. Code Ann. § 29-28-108. As discussed in in Sections (G)(i)-(ii) *supra*, Tracki devices are unreasonably dangerous under both statutory tests, and the exclusion is therefore inapplicable on its face.

Second, the relevant inquiry under § 29-28-108 is whether the challenged use was "reasonably anticipatable" by the manufacturer. Defendants cannot claim immunity by labeling the stalker's conduct "abnormal," when that very misuse was not only foreseeable, but affirmatively encouraged and profited from. ¶ 11, 26-29, 48. Defendants received weekly law enforcement subpoenas for precisely the type of conduct alleged here. ¶ 11. They responded not by redesigning the product, changing their marketing strategy, or adding safeguards, but by publishing instructions on how to conceal the device more effectively and marketing it as a tool for monitoring romantic partners. ¶¶ 12–15, 26–29. Under these circumstances, the "abnormal use" defense is unavailable as a matter of law, or, at a minimum, presents a factual question for the jury.

Defendants' argument mischaracterizes both Plaintiff's allegations and the governing standard under the TPLA. Plaintiff does not merely propose an alternative feature that would transform the Tracki into a different product (MTD at 30); rather, she alleges that Defendants' design is defective because it omits readily available, technologically feasible safety features that

30

would mitigate the foreseeable and grave risk of non-consensual tracking and stalking in its existing product. The existence of safer, practical alternative designs—already implemented in competing products—supports a finding that the Tracki is unreasonably dangerous, not that it is a different device. Nor does the fact that Defendants' product functions as intended—i.e., that it successfully tracks a target—defeat Plaintiff's claims. MTD at 30. Under Tennessee law, a product may be defective and unreasonably dangerous *even if* it performs its intended function, where that function itself creates unreasonable risks beyond those contemplated by the ordinary consumer. The relevant inquiry is not whether the device "works," but whether it is designed in a manner that exposes users and foreseeable victims to unreasonable danger. At this stage, the FAC need only allege facts that plausibly support Plaintiff's claims under the TPLA; Plaintiff is not required to prove them. *Smith v. Zoll Med. Corp.*, 505 F. Supp. 3d 787, 796 (W.D. Tenn. 2020).  She has undoubtedly met that burden.

### H.  The New York Failure to Warn Claims are Well-Pled and Legally Sufficient

It is well settled New York law that a manufacturer "may be held liable for placing into the stream of commerce a defective product which causes injury." *Gebo v. Black Clawson Co.*, 92 N.Y.2d 387, 392 (N.Y. 1998). A product may be rendered defective through a manufacturing flaw, a defective design, or a lack of adequate warnings. *Matter of New York City Asbestos Litig.*, 59 N.E.3d 458, 468-69 (N.Y. 2016). Where liability is based on a failure to warn claim, New York views negligence and strict liability claims as equivalent, and as such, Counts III (Strict Liability – Failure to Warn) and IV (Negligence – Failure to Warn) can be analyzed together. *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 439 (S.D.N.Y. 1999).

A plaintiff asserting claims based on a manufacturer's failure to warn must allege sufficient facts to show that: (1) the manufacturer had a duty to warn; (2) against dangers resulting from foreseeable uses about which the manufacturer knew or should have known; and (3) that the

31

manufacturer's failure to provide adequate warnings proximately caused the plaintiff's injuries. *Barban v. Rheem Textile Sys.*, 2005 U.S. Dist. LEXIS 5996, at \*28 (E.D.N.Y. Feb. 11, 2005). A manufacturer's duty to warn extends not only to potential dangers it was aware of, but also those which, through the exercise of reasonable care, it would have discovered. *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 305 (N.Y. 1998); *see also Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 91 (2d Cir. 1980). Put another way, "the manufacturer must anticipate those uses of its product that are reasonably foreseeable, and even if those uses are unintended, warn consumers about their danger." *Barban*, 2005 U.S. Dist. LEXIS 5996, at \*28. A defendant's act is a proximate cause where, after weighing all the factors, the act was a substantial cause of the events producing the injury. *Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016); *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 209 (N.Y. 1983). Where proximate causation turns on the actions of a third party, the general rule is that "an intervening act which is a normal consequence of the situation created by a defendant cannot constitute a superseding cause absolving the defendant from liability." *Lynch v. Bay Ridge Obstetrical & Gynecological Assoc., P.C.*, 532 N.E.2d 1239, 1241 (N.Y. 1988) (internal citation omitted); *see also Hain*, 68 N.E.3d at 1237-38.

Plaintiff has alleged sufficient facts supporting these elements with regards to the Tracki devices. Plaintiff has shown that Defendants manufactured and sold a device that enabled the surreptitious tracking of individuals without providing any warnings to individuals who might be subject to unwanted stalking, tracking, and harassment. *See* ¶¶ 22-38. It was eminently foreseeable that Tracki's devices would be used to determine the minute-by-minute locations of individuals without their consent. Despite this eminently foreseeable danger, Tracki failed to provide any warnings, notifications, or alert systems in its devices or accompanying software to protect individuals who might be harmed due to the unwanted tracking it facilitated. Not only did Tracki

32

fail to warn about this behavior; it actively encouraged it. Tracki's website notes that its device is easy to use and can be used to follow "loved one[s] you want to watch over and stay connected to." ¶ 29. Further, a Tracki blog post lists the best places to hide a Tracki device on a vehicle so that it won't be discovered. ¶ 26-27. That blog post states that some of the uses are to follow a teen driver and to ensure that your spouse is not cheating; however, the post also notes that if the device is discovered, "a family conflict may arise". ¶ 26.

Defendants had a duty to warn individuals that their products could be used to facilitate unwanted tracking, and it failed to provide *any* warning to potential victims. The lack of any warnings was a proximate cause of Plaintiff's injuries. Plaintiff was repeatedly stalked through the use of a Tracki device, which gave her no warning that her location was being tracked or followed. ¶¶ 66-71. As a result of being stalked, Plaintiff has incurred significant injuries, including emotional distress, anxiety, and significant out-of-pocket expenses. ¶¶ 74-75. As such, Plaintiff has alleged facts supporting her claims for liability based on failure to warn, and Defendants' motion should be denied on those grounds

Defendants' arguments in favor of dismissal on this point are spurious at best. Despite Defendants' claims that Plaintiff failed to identify any inadequacies in Tracki's warnings, Plaintiff has identified numerous warning deficits, such as the lack of tracking warnings. ¶¶ 33-34. The simple fact of the matter is that Plaintiff identified the inadequacies of Tracki's warnings by pointing out that there are no Tracki warnings provided to individuals being tracked. A single sentence on Tracki's website does not provide any meaningful warning to individuals being tracked, since, due to the nature of the Tracki device, they would not even be aware that they were being tracked in the first place. The website is, at best, a fig leaf that is at odds with Tracki's own statements regarding its devices' uses.

33

A manufacturer has a duty to warn against reasonably foreseeable uses of its product, even unintended uses. Defendants cannot argue that the use of its devices to surreptitiously track individuals was unforeseeable when its marketing and website statements make clear that surreptitious, nonconsensual tracking is the intended purpose of the Tracki device. Nevertheless, Defendants argue that a manufacturer has no duty to warn consumers of potential criminal misuses of its products. *Alston v. Caraco Pharm., Inc.*, 670 F. Supp. 2d 279 (S.D.N.Y. 2009). The focus of that rule is on the criminal *misuse* of a product, as such a use is inherently unforeseeable. *Alston* is illustrative of this point. There, a prisoner sued Caraco for a failure to warn, where the pills in question had FDA-approved labels, and the prisoner had allegedly contracted Hepatitis B by taking pills from another prisoner's mouth. *Alston*, 670 F. Supp. 2d at 286. In granting summary judgment, the court held that "[t]his extraordinary action is well-beyond the scope of the foreseeable use of tramadol and, therefore, is well-beyond the scope of Ortho's duty to warn." *Id.* Therefore, even where quasi-criminal acts are involved, the central focus of the analysis is whether the harm *complained of* was foreseeable by the manufacturer, and as stated above, Tracki cannot argue that the surreptitious tracking of individuals was unforeseeable.

## I.    The Design Defect Claim is Well Pled

As discussed *supra*, a product may be rendered defective through a manufacturing flaw, a defective design, or a lack of adequate warnings. *Matter of New York City Asbestos Litig.*, 59 N.E.3d 458, 468-69 (N.Y. 2016). "[T]o establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss*, 450 N.E.2d at 208. In determining whether a product was "not reasonably safe", courts engage in a risk-utility analysis, whether a reasonable person would conclude that the product's utility was outweighed by the risk

34

inherent in the product containing the alleged defect. *Id.; see also Sorto Romero v. Delta Int'l Mach. Corp.*, 2007 U.S. Dist. LEXIS 71588 (E.D.N.Y. Sept. 24, 2007). Among the factors to be considered are: (1) the product's utility to the public and individual users; (2) the likelihood that the product will cause injury; (3) the availability of a safer design that are functional and reasonably priced; (4) the ability of the plaintiff to have avoided injury by the product; (5) the plaintiff's awareness of the product's danger; and (6) the manufacturer's ability to spread any cost related to improving the safety of the design. *Voss*, 450 N.E.2d at 208-09 (citing Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837-38 (1982)). Additionally, the plaintiff must allege facts showing that safer, feasible design alternatives existed at the time of manufacture. *Barban v. Rheem Textile Sys.*, 2005 U.S. Dist. LEXIS 5996, at *24 (E.D.N.Y. Feb. 11, 2005).

Plaintiff has alleged facts showing that the risks of harm posed by the Tracki device far outweigh any utility the product provides, rendering the design defective. As discussed above, the main purpose of the Tracki device is to surreptitiously and non-consensually track, in real-time, the location and movements of individuals. ¶¶ 30-36. While the device can be used to track objects, Tracki's own marketing reveals that the main function is to track *people* without their awareness. ¶¶ 22-29. However, that utility dramatically increases the likelihood that the Tracki device will cause injury to individuals like Plaintiff, who will be tracked, stalked, and harassed by actors using the Tracki device. Further, Plaintiff has alleged facts showing that the design of the Tracki device makes it virtually impossible for victims to be aware that they are being tracked. ¶¶ 31-35. Further, even if a victim was able to locate a Tracki device through a manual search, there is virtually no way to determine who the device originally belonged to. ¶¶ 36-37. This design subjects potential victims to serious risks of harm, including stalking, harassment, and even violence. As such,

35

Plaintiff has alleged facts showing that the potential risks of the Tracki device far outweigh its potential utility.

Plaintiff has also alleged that alternative, feasible designs for the Tracki device were available but not included in the product's design. For example, Plaintiff has alleged facts showing that the Tracki device could use Bluetooth signals, like other publicly available tracking devices, instead of GPS in order to allow smartphone unwanted tracking alerts. ¶¶ 33-34. Further, Plaintiff alleged that the current iteration of the Tracki device fails to provide any other form of notice or audible signal to notify individuals that they are being tracked. ¶ 3. Plaintiff also alleged facts that the current design of the device is made with minimal size and low visibility form factors, allowing the device to be planted with a low possibility of detection. ¶¶ 31-33. Finally, Plaintiff alleged facts showing that the internal sticker containing the device number was easily removable, eliminating the ability to identify the device's owner. ¶ 37. In short, Plaintiff has alleged sufficient facts to highlight design features that could feasibly be changed, which would mitigate the potential harms caused by unwanted tracking while still preserving the Tracki device's legitimate functions. The presence of these alternative design features renders the current iteration of the Tracki device defective.

The Tracki device's defective design was a proximate cause of Plaintiff's injuries. As a result of the Tracki device, Plaintiff had her real-time location exposed to her stalker. This enabled her stalker to track her movements, follow her, and harass her repeatedly. As a result of these events, Plaintiff has suffered emotional distress, anxiety, and significant out-of-pocket expenses. The actions of Plaintiff's stalker were clearly foreseeable, as the Tracki device is sold and marketed as a tool to be used for the surreptitious tracking of individuals. As such, Plaintiff has alleged

sufficient facts to support her claim for strict liability due to a defective design, and Defendant's argument should be denied on those grounds.

In arguing that the Tracki device was not defective, Defendants rely on a misunderstanding of what constitutes a design defect in the legal sense. Defendants argue that Plaintiff failed to identify a defect, since the device functioned as intended, as a tracking device. To the extent that Defendants argue the central purpose of the Tracki device is to track individuals and that the Tracki device functioned as it was designed by Defendants, we agree. However, the test for whether a product is defective does not rest on the manufacturer's goals and intentions; rather, it rests on the risk-utility analysis identified by the *Voss* court. Indeed, "[w]here a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed." *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 403 N.E.2d 440 (N.Y. 1980). Regardless of whether the Tracki device functioned as Defendant intended, Plaintiff has alleged sufficient facts showing that it is defectively designed.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss Plaintiff's First Amended Complaint in its entirety, and if necessary, grant Plaintiff leave to amend as needed.

Dated: April 9, 2026                                    Respectfully Submitted,

                                                        */s/ Edwin J. Kilpela, Jr.*
                                                        Edwin J. Kilpela, Jr., Esq.
                                                        Paige T. Noah, Esq.
                                                        WADE KILPELA SLADE, LLP
                                                        6425 Living Pl., Suite 200
                                                        Pittsburgh, PA 15206

37

Telephone: (412) 314-0515
Email: ek@waykayslay.com
pnoah@waykayslay.com

## WORD COUNT CERTIFICATION

Pursuant to the Court's Order granting Defendants leave to file a memorandum with an enlarged word limit of up to 11, 347 words – a limit equally applicable to Plaintiff (ECF No. 64), I hereby certify that the total number of words in the above memorandum, excluding the caption, table of contents, table of authorities, signature block and word count certification is 11,347.

By: */s/ Edwin J. Kilpela, Jr.*
Edwin J. Kilpela, Jr.

39